THE TEXAS-EMPIRE PIPE LINE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78604. Promulgated July 19, 1940.

*B. H. Bartholow, Esq.,* for the petitioner.
*John E. Marshall, Esq.,* for the respondent.

374

OPINION.

KERN: Since the second question, whether the dividend distributed on November 30, 1932, the day before the liquidation of petitioner's subsidiary, was a liquidating dividend, as respondent contends, or an ordinary one does not require extended consideration, we shall dispose of it now. If we should find it a liquidating dividend, it must

be treated like the distribution admittedly made in liquidation of the corporation on December 1, 1932. Section 115 (a) and (c), Revenut Act of 1932, set out in the margin,[1] is here involved.

The petitioner contends that the November dividend was paid in accordance with a long established practice of its subsidiary to pay out all its earnings and profits every quarter or half year. The dates of payment of these dividends and the company's minutes authorizing the payments have ben set out fully in the findings. The revenue agent thought that the regularity of distribution indicated a general practice and that this last dividend was herefore not taxable, and the Interstate Commerce Commission likewise treated it as an ordinary dividend.

Respondent relies on the presumptive correctness of his determination and on the Fifth Circuit Court's decision in *Canal-Commercial Trust & Savings Bank* v. *Commissioner*, 63 Fed. (2d) 619, affirming 22 B. T. A. 541. Needless to say, we are not bound by the revenue agent's opinion or by the Interstate Commerce Commission's treatment of the dividend. In the *Canal-Commercial Trust & Savings Bank* case, the taxpayer received from a national bank $1,000,000 ostensibly as an ordinary dividend on December 30, 1920. On December 21 the directors of the taxpayer had voted to liquidate the national bank, and on December 30 they had authorized the purchase of all assets and the assumption of liabilities of the national bank. On December 31, the day after the dividend in question was voted and paid to the taxpayer, the directors of the national bank voted to liquidate by transferring all its assets to the taxpayer. The national bank had previously, in the same year, declared and paid dividends in July and December. The two banks had interlocking directorates and the taxpayer owned 95 percent of the stock of the national bank. The court pointed out that the fact that the distribution was wholly from surplus and not from capital was not decisive, but merely evidential. The distributions in *Hellmich* v. *Hellman*,

[1] SECTION 115. DISTRIBUTION BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" when used in this title (except in section 203 (a) (4) and section 208 (c) (1), relating to insurance companies) means any distribution made by a corporation to its shareholders, whether in money or in other property, out of its earnings or profits accumulated after February 28, 1913.

\* \* \* \* \* \* \*

(c) DISTRIBUTIONS IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. In the case of amounts distributed in partial liquidation (other than a distribution within the provisions of section 112 (h) of stock or securities in connection with a reorganization) the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits within the meaning of subsection (b) of this section for the purpose of determining the taxability of subsequent distributions by the corporation.

276 U. S. 233, and *Tootle* v. *Commissioner*, 58 Fed. (2d) 576, where they were wholly from profits were, nevertheless, held liquidating dividends. As was said by the Supreme Court in *Hellmich* v. *Hellman, supra,* an ordinary dividend is "a distribution made by a going corporation to its shareholders in the ordinary course of business", and in the *Canal-Commercial Trust & Savings Bank* case the Circuit Court thought that a distribution by a national bank of its entire surplus, 200 percent, was hardly compatible with it continuing in business. The final convincing fact was the arrangement made by the national bank's 95 percent shareholder, the taxpayer, to buy the bank's assets and to liquidate its stock at the very same time that the national bank should declare and pay its dividend; a fact which, said the court, "leaves no doubt that it had been determined in advance, and that the $1,000,000 authorized to be turned over on December 30th was but a step in the final liquidation accomplished on December 31st."

The facts in the instant case are strikingly similar. Petitioner's insistence that its subsidiary was making a regular distribution of current earnings is unconvincing in the circumstances. Its distributions had all been made for the three years last past at the end of each quarter of the calendar year, so that if petitioner's theory be allowed, it would not sustain the ordinary dividend character of a distribution on November 30 which would normally have been made only on December 31. The petitioner contends that liquidation here followed the dividend of November 30, and so it did, but by only one day. There is nothing to indicate that the petitioner on November 30 intended to keep its subsidiary in operation and then changed its mind on the morrow; and, in the absence of such evidence, we must assume that dissolution was in contemplation on the eve of its being put into effect, and this assumption leads inevitably to the conclusion that dividend and dissolution were part and parcel of the same plan. We think that the *Canal-Commercial Trust & Savings Bank* case is controlling here, and hold accordingly.

We turn now to the question whether petitioner realized a gain, as respondent contends, or suffered a loss on the liquidation of its Illinois subsidiary. The essential question of the case, since the cost of the subsidiary's assets is stipulated, is the fair market value of the assets on distribution to petitioner. There is a preliminary legal question, however, which we must dispose of first, for if petitioner's contention with regard to it is sound, we need not proceed further.

Petitioner contends that its relation to its wholly owned subsidiary was substantially that subsisting between the taxpayer and its wholly owned subsidiary in *Southern Pacific Railroad Co.* v. *Lowe,* 247 U. S.

330, and that in determining the tax consequences of the transactions between it and its subsidiary the separate corporate entity of the latter must be ignored and disregarded. In that case, where a large surplus had been accumulated by the subsidiary before March 1, 1913, the first effective date of the new Federal income tax, and the parent corporation caused its subsidiary to declare a dividend from this surplus and to pay it by a credit against the taxpayer's indebtedness to the subsidiary, the Supreme Court held that the dividend was not taxable to the parent corporation, basing its conclusion upon the fact that the income "in mere form only, bore the appearance of income accruing after that date [March 1, 1913], while, in truth and in substance, it accrued before; and upon the fact that the Central Pacific and the Southern Pacific were in substance identical because of the complete ownership and control which the latter possessed over the former, as stockholder and in other capacities." The matter was treated as a "paper transaction"; and, so far as the dividends represented surplus of the Central Pacific accumulated before January 1, 1913, "They were not taxable as income of the Southern Pacific within the intent and meaning of the Act of 1913." The Court was careful to point out in conclusion that "the case turns upon its very peculiar facts, and is distinguishable from others in which the identity of a controlling stockholder with his corporation has been raised. *Pullman Car Co.* v. *Missouri Pacific Co.*, 155 U. S. 587; *Peterson* v. *Chicago, Rock Island & Pacific Ry.*, 205 U. S. 364, 391." Again, six months later, in December 1918, the Supreme Court reaffirmed in somewhat similar circumstances the same principle in *Gulf Oil Corporation* v. *Lewellyn*, 248 U. S. 71. There the taxpayer was a holding company owning substantially all the stock in the other corporations concerned, and decided in January 1913 to take over the previously accumulated earnings and surplus. The subsidiaries had invested their earnings in property necessary for the business and owed certain debts *inter sese*. The taxpayer by the transfer became the creditor of the subsidiaries and also the recipient of their earnings. The Court noted that the taxpayer did not itself do the business of its subsidiaries and have possession of their property, as in the *Southern Pacific* case, but thought that its principle must be taken to cover this case, saying "that the debts were all enterprise debts due to members, and that the dividends represented earnings that had been made in former years and that practically had been converted into capital."

It will be observed that in both these cases a factor which weighed heavily with the Court and which is not present here was that the dividends distributed were from earnings accumulated before the effective date of the first income tax act.

After its decisions in the *Southern Pacific & Gulf Oil Co.* cases the Supreme Court has taken occasion in several later cases to limit expressly their effect to the special facts presented therein. *Lynch* v. *Hornby,* 247 U. S. 339; *Burnet* v. *Commonwealth Improvement Co.,* 287 U. S. 415. In the latter case the Court said: "*Southern Pacific Co.* v. *Lowe, supra,* and *Gulf Oil Corporation* v. *Lewellyn, supra* (the latter covered in principle by the first), can not be regarded as laying down any general rule authorizing disregard of corporate entity in respect of taxation. These cases presented peculiar situations, and were determined upon consideration of them * * *." In view of these repeated and expressed limitations placed by the Supreme Court upon its decisions in these cases, we take it that they will only be applied to other cases having identical facts. From an examination of *Burnet* v. *Commonwealth Improvement Co., supra,* in the light of the recent decision of the Supreme Court in *Higgins* v. *Smith,* 308 U. S. 473, we consider the general rule to be that, if a taxpayer creates a corporation for its own purposes and enjoys advantages from the corporate life which it has created, then it must accept the tax consequences and the corporate entities will not be disregarded in order to save it from such consequences. It is our opinion that the instant proceeding should be governed by the general rule and is not subject to the narrow exception limited to the facts of *Southern Pacific Railroad Co.* v. *Lowe, supra,* and *Gulf Oil Corporation* v. *Lewellyn, supra.*

It need scarcely be pointed out that petitioner's claim of a loss on the liquidating distribution of its subsidiary's assets is at complete variance with its contention that parent and offspring were one for tax purposes. On its own theory, therefore, we could not allow the refund claimed. On the theory which we believe to be the correct one in the circumstances, that parent and subsidiary were distinct corporate entities for tax purposes, whether there was a gain or loss will depend upon the value of the assets of the subsidiary distributed in the taxable year. Serious consideration need not be given to the petitioner's argument that there was here a *de facto* merger of the subsidiary into the taxpayer such as happened in *Helvering* v. *Metropolitan Edison Co.,* 306 U. S. 522, for the facts here will not sustain such a claim.

We turn, then, to the valuation question. There is no dispute over the basis for the computation, but only upon the correct method to be applied. Respondent urges that the fair market value of the assets of the subsidiary as a going concern when distributed to petitioner on December 1, 1932, was $11,100,000. Two expert witnesses were put on the stand to sustain this contention. We shall examine later the method employed. Petitioner, on the other hand, argues (1) that its pipe line system as a whole (including the Illinois and

Indiana assets received upon liquidation of its subsidiary) had at the end of 1934, after the system had been thoroughly established, as its only intangible asset a going concern value of not more than $497,435; and that if it be assumed that a part of this intangible value could be attributed to the Illinois and Indiana assets on the basis of relative investments, the intangible value attributable to the Illinois and Indiana assets was not more than $203,948. This figure is reached by taking the Interstate Commerce Commission value for all of petitioner's assets determined for 1934 of $14,503,918 (see Exhibit C) as the ultimate total, and computing going concern value (that is, as petitioner used the term, the element of intangible value derived solely from the operation of the subsidiary as a going concern and not this intangible value plus the value of the physical assets) by averaging original cost and reproduction cost, deducting depreciation, and deducting a further $75,000 for working capital. The petitioner next contends (2) that the physical assets received by petitioner on liquidation had no greater value than the cost of reproduction less depreciation, which it puts at $5,100,000; that (3) on the basis of sales of comparable assets within a short time of the period of liquidation, the assets received by petitioner were not worth more than $5,186,210.80. Finally (4) petitioner argues that if any intangible asset was received by petitioner on liquidation, it had no fair market value which could be determined and hence that no gain was realized. We shall examine these contentions more precisely after reviewing the respondent's arguments, and need add only that petitioner denies that A. R. M. 34, C. B. 2, p. 31 (1920), or Hoskold's formula has any application in the premises.

This great discrepancy in the calculation of fair market value on the basic date is accounted for wholly by respondent's contention that the subsidiary's assets had a going concern value on that date which would more than double their reproduction cost. There appears to be no material dispute on reproduction cost. This contention rests on the theory that there was an intangible value to be determined from the subsidiary's earnings, which are set out in full in the stipulated findings.

Summarized, these findings show an average annual number of barrels of oil transported by the subsidiary in the 3 years next preceding the basic date of from 15 to 19⅔ millions, the highest point being reached in 1931; and of these, an average number of barrels transported for others having no interest in either the subsidiary or petitioner of from 5⅔ to 8⅓ millions. The subsidiary's net income, before deduction of Federal income taxes, in the same period ran from 1½ to 2⅔ million dollars. A detailed statement of its gross income and net income in those years may be found in the findings and need not be set out here. It is agreed that the pipe line had a daily capacity

of 70,000 barrels, and a probable life of 20 years more, on an annual average of operation of not more than three-fourths of its maximum capacity.

The respondent urges that the Interstate Commerce Commission's tentative report, agreed by the parties to be treated as final, as of December 31, 1934, which was, of course, made for rate-making purposes, does not measure the fair market value as of the basic date. The Interstate Commerce Commission valuation was $14,503,918 for all of petitioner's assets, including the Illinois and Indiana assets of the subsidiary here in question. Respondent points out that the petitioner made a protest against the lowness of this valuation, and petitioner responds that the protest was *pro forma* and merely to save to itself any rights in the future. The following paragraphs of petitioner's protest are those relied on by respondent:

(4) FINDING OF GOING-CONCERN VALUE ERRONEOUSLY OMITTED.—The carrier protests that the Commission while stating that it has given consideration to going-concern value, has failed to make any finding of such value or to show to what extent, if at all, such value was taken into account in the determination of the final value found. Thus the Commission failed to give recognition to the requirement of law that there is an element of value in the assembled and established plant of this carrier, which was and is doing business and earning money, over one not thus advanced, and that such value should be separately shown and explained. It has by such error, greatly reduced the sum which it should find as the final value of the carrier's property.

\* \* \* \* \* \* \*

(6) FINAL VALUE ERRONEOUSLY FOUND.—The carrier protests that the Commission has erroneously found final value of the carrier's property in that: (a) such final value which it has determined is based, among other things, upon the erroneous findings and improper methods hereinabove described, and (b) such final value has been determined without reporting separately other values and elements of value, and an analysis of the methods of valuation employed, together with the reasons for the differences between such value and each of the cost values which the Commission has found. Thus the Commission has found final value of the carrier's properties to be much less than their true value. More specifically the Commission (Page 7) has failed to show how much it has allowed for appreciation, depreciation, and going-concern value, in determining the final value found. It has likewise failed to state what is meant by "all other matters" which it refers to as having been considered. It attempts no explanation as to why its final value of property owned and used is $14,500,000 while its findings of original cost, cost of reproduction new, and cost of reproduction new less depreciation are different. The Commission further errs in restricting its finding of final value to final value for "rate-making purposes", and thus fails to make the findings required by law. [Stipulation, Exhibit D, pp. 6–8.]

The authorities relied on by respondent to support this point will be discussed later.

The respondent then launches into the positive evidence adduced to sustain his theories. He put on the stand two expert witnesses. The first testified to a fair market value of $12,300,000, reached by disregarding 1929 and 1930 earnings on the ground that the pipe line was

then not in full operation and did not become so until the new pumping stations were installed on November 1, 1930. He considered earnings for 1931 and 1932, deducted an estimated Federal tax at the rate of 13¾ percent (in force in 1932) and a further amount for expenses as a going concern, since all of the subsidiary's operating expenses were paid by petitioner, and arrived at an average annual rate of $2,050,000, to which he applied a time-earning factor of 6. This factor was determined by consideration of market conditions on December 1, 1932, such as the yield of bonds of various classes and other factors relating to commercial paper, the earnings of companies which paid dividends without reduction in those years, and the market on which the company's stock would have had to be sold if it had been an independent going concern at the time. This computation resulted in a time-earning factor of 8, for which he conservatively substituted 6.

The other witness testified to a fair market value of $11,100,000. He took stipulated net income for the eleven months of 1932, and on it computed average annual earnings for 1931 and 1932, which he found to be, before deduction for Federal taxes, $2,429,343. He took the average operating capacity of 73½ percent in prior years, and the stipulated life of 20 years, based on a 75 percent maximum capacity operation, and concluded on these data that the average earnings for 1931 and 1932 were conservatively representative of the stipulated expectancy of the system. The next question was segregation of the subsidiary from petitioner's system, one of the results of which would be a probable demand by the western line, by reason of its strategical situation in relation to the origin of shipments, of 20 percent of the tariff as a fee, with a consequent reduction of income; or in result that an average annual transportation revenue of $3,064,-025 would be reduced by $612,805. A further allowance of $50,000 was made for executive officers of the independent company, and an allowance for Federal taxes, and the final figure of $1,523,639 emerged as a reasonable expectation of future annual net earnings. Taking this figure, he applied Hoskold's formula to obtain present worth. He stated that: "Therefore, on the basis of an economic life of 20 years, as stipulated, I have taken 20 times the anticipated income of $1,523,639, which amounts to $30,472,780 over a period of 20 years. Applying the factor for compound discount at 10 percent, sinking fund accumulation, and 3 percent compound interest over a period of 20 years of income at the same level, or the factor .36439, I have as a product indicating the present value of this business $11,103,976 * * *." He summarized his final determination as follows:

That means this: Assuming that we have a willing buyer and a willing seller, the seller, that is, the parent company, is selling for $11,000,000 assets which it contends are worth $5,000,000, and having made that handsome profit, also will for the next 20 years receive commissions for business originated and delivered to this line annually of some $600,000.

So, it does not look like a disastrously bad deal for the seller.

On behalf of the buyer, it means he has expended $11,000,000 upon which he should receive annually earnings of $1,100,000 for a period of 20 years and still have left his $11,000,000 which does not seem like a bad deal for the buyer.

The respondent's witnesses appeared to be fully qualified professionally to give expert testimony in such matters. The only fact raised by petitioner in derogation of their competence was that neither had even been engaged in the pipe line business.

The testimony of petitioner's witnesses may be briefly summarized. J. L. Culbertson, petitioner's chief engineer, testified solely as to replacement cost, and stated that he had never heard of any pipe line company paying more for a part of a pipe line system than its replacement cost in the condition at the time. C. M. Scott, chief engineer for another pipe line company, testified to the same general effect; and so did J. N. Hunter, general superintendent for another oil company. The petitioner's evidence stops here, but in argument it raises the question of comparable sales of pipe line assets at about the same time, the only evidence of which is drawn from the Interstate Commerce Commission's valuation reports put in evidence by petitioner solely to establish the valuation which the commission put upon the assets of petitioner's subsidiary. Regardless of the admissibility of these reports for this purpose, however, we think that the data to be drawn from these reports are entirely insufficient to sustain any argument of "sales of comparable assets." While the reports are competent evidence of the market value of such assets, if properly presented, the sales therein mentioned lose all significance unless all the vital factors, many of which are lacking, are known; and hence we do not stop to discuss them.

The whole question narrows down, therefore, to whether reproduction cost or going concern value is the proper method of determining the value of the subsidiary's assets on the basic date. If the former is proper, the Interstate Commerce Commission's valuation is of great importance; if the latter rate is proper, we think that respondent has fairly made his case.

There can be no doubt that, on the authorities, going concern value of the business as an organic whole, as opposed to the inert value of its several assets, and independent of franchises or good will, is recognized as real. *Omaha* v. *Omaha Water Co.*, 218 U. S. 180; *Des Moines Gas Co.* v. *Des Moines*, 238 U. S. 153; *McCardle* v. *Indianapolis Water Co.*, 272 U. S. 400; *Los Angeles Gas Co.* v. *R. R. Commission*, 289 U. S. 287. This is true for tax purposes as well as for rate-making purposes. The principle, as there applied in the case of a state direct property tax on a corporation doing an interstate business, was succinctly stated by Holmes, J., in *Fargo* v. *Hart*, 193 U. S. 490:

\* \* \* On the other hand, it can tax property permanently within its jurisdiction although belonging to persons domiciled elsewhere and used in commerce

among the States. And when that property is part of a system and has its actual uses only in connection with other parts of the system, that fact may be considered by the State in taxing, even though the other parts of the system are outside of the State. The sleepers and rails of a railroad, or the posts and wires of a telegraph company, are worth more than the prepared wood and the bars of steel or coils of wire, from their organic connection with other rails or wires and the rest of the apparatus of a working whole. This being clear, it is held reasonable and constitutional to get at the worth of such a line in the absence of anything more special, by a mileage proportion. The tax is a tax on property, not on the privilege of doing the business, but it is intended to reach the intangible value due to what we have called the organic relation of the property in the State to the whole system. *Western Union Telegraph Company* v. *Taggart*, 163 U. S. 1, 21, 22. * * *

Somewhat later the same great judge said, in *Galveston, Harrisburg &c Ry. Co.* v. *Texas*, 210 U. S. 217, 225, 227, which involves a state gross receipts tax:

* * * As the property of companies engaged in such commerce may be taxed, *Pullman's Palace Car Co.* v. *Pennsylvania*, 141 U. S. 18, and may be taxed at its value as it is, in its organic relations, and not merely as a congeries of unrelated items, taxes on such property have been sustained that took account of the augmentation of value from the commerce in which it was engaged. *Adams Express Co.* v. *Ohio State Auditor*, 165 U. S. 194; S. C., 166 U. S. 171; *Fargo* v. *Hart*, 193 U. S. 490, 499. So it has been held that a tax on the property and business of a railroad operated within the State might be estimated *prima facie* by gross income, computed by adding to the income derived from business within the State the proportion of interstate business equal to the proportion between the road over which the business was carried within the State to the total length of the road over which it was carried. *Wisconsin & Michigan Ry. Co.* v. *Powers*, 191 U. S. 379.

* * * * * * *

* * * The State must be allowed to tax the property and to tax it at its actual value as a going concern. * * *

In the instant case petitioner collected the charges for transportation of crude oil at rates set out in published tariffs filed with the Interstate Commerce Commission and apportioned these charges between itself and its subsidiary on a *pro rata* mileage basis, with a credit on its books to the subsidiary for the share apportioned to it. These tariffs were substantially the same as other tariffs filed by other crude oil pipe line carriers in the Middle West area, the tariffs of railroad carriers being about 50 percent higher. The respondent points out that binding contracts for the transportation of oil were in effect on December 1, 1932, the basic date. On its contracts and under the tariffs in effect for the four years of its existence which ended on that day, the subsidiary had cleared operating profits of over $5,500,000. With these facts before him, the Commissioner emphasizes the necessity of applying the words of the statute, "fair market value," and argues that earnings constituted an important element in that value. In so far as the petitioner's argument that the value of the intangible interest, if any, was impossible to deter-

mine, it relies on what was said by Learned Hand, J., in *Helvering* v. *Walbridge*, 70 Fed. (2d) 683. We agree with respondent that any comfort to be taken from this decision was largely dissipated by the same learned judge a month later in *Houghton* v. *Commissioner*, 71 Fed. (2d) 656. The discussion of other cases cited we think idle, since, for the reasons already given, we regard the method used by the respondent as proper if it is applicable here.

We think that further discussion of a method of valuation so long accepted by the highest court as proper, or the multiplication of citations to support so well established a rule, is entirely unnecessary. Undoubtedly going concern value, determined by reference to earnings, is the proper method to be applied here unless the situation of the taxpayer and its parent corporation is so peculiar as to take it out of the operation of the general rule. Respondent's method of valuation approved, we must also accept his computation of value; so that our sole question is whether circumstances justify the exception claimed. There is one point, however, upon which petitioner relies which must be disposed of before we proceed to the final question.

Petitioner throughout insists that the determination of the valuation of its entire assets by the Interstate Commerce Commission is binding on us. Its method of computation of the separate value of its subsidiary's assets by apportionment of this total value has already been set out in our summary of its argument, including its treatment of a so-called "going concern value" which is radically different in nature from that to which respondent in argument addresses himself, and, by the same token, different from the measure used in numerous cases decided by the Supreme Court. We have already pointed out in our resumé of the arguments that petitioner itself had strenuously objected to the Interstate Commerce Commission's finding of value as insufficient, which objection it now says was merely *pro forma*. Whether it was so or not we need not now determine, for we have already concluded that the respondent's method of using "going concern value" is to be preferred to reproduction value, which appears to be the basis of Interstate Commerce Commission value; and it remains only to say that that commission's determination of value for rate-making purposes can not bind us in fixing value for tax purposes. Although the Interstate Commerce Commission and this Board are coordinate branches of the same Government, it does not need argument to show that the difference in our functions would not render wholly disparate valuation figures arrived at by widely distinct methods, in themselves contradictory. As we said in *James Couzens*, 11 B. T. A. 1040, 1161:

In any case such as this, requiring the determination under the income tax laws of value of property on March 1, 1913, the problem of valuation is ap-

proached with little or no restriction arising from the purpose of the litigation. It is, for example, unlike a proceeding to determine the value in respect of which an interstate carrier or local utility is to have its rates regulated, the theory of valuation in such a case being considered in the light of its effect upon the more important ulterior problem of public rate regulation. Under section 202 of the revenue laws, the value to be ascertained is, in terms, absolute, the only purpose being to measure the tax by the gain above the value on March 1, 1913. * * *

To state petitioner's argument in its proper perspective it is necessary once more to glance at the origins of petitioner and its subsidiary. In 1928 the Texas Corporation and the Empire Gas & Fuel Co., two corporations whose subsidiaries were producers of crude oil in the Mid-Continent belt, agreed to cooperate in the construction of a pipe line system, mainly to meet the requirements of their subsidiaries. On October 31 of that year they accordingly organized the petitioner, whose stock they halved between them and thereafter controlled, in order to carry out this purpose. The subsidiary of petitioner here in question was brought into being as an Illinois corporation on November 17, 1928, to act as a pipe line carrier in that state, the petitioner not having the legal power under Illinois law to exercise the right of eminent domain. Construction of a pipe line in Illinois and Indiana was accordingly started late in 1928 and finished in October 1929. The petitioner's subsidiary owned, therefore, a portion of a much larger pipe line system, its own pipes beginning east of the center of the Mississippi River and extending into Illinois and Indiana, with six pumping stations in the former state, and tankage and general equipment in both states. These facts, petitioner contends, constitute the subsidiary's system only a "plant facility", a link in the greater system, which extended from Oklahoma to Illinois and Indiana, and was controlled by petitioner and petitioner's corporate overlords. Petitioner's subsidiary's business was only what the subsidiary got from these overlords; it "originated no business, entered into no contracts for the transportation of crude oil, and had no contacts whatever with the public." It did, indeed, have contracts with others, but these, petitioner says, were negotiated and controlled by petitioner. The Interstate Commerce Commission fixed tariffs for its carriage of oil, but this, petitioner says, was a mere bookkeeping matter, not a gauge or limitation on profits to the subsidiary. Its earnings, therefore, while taxable to it as income, were, so petitioner urges, merely the result of a more or less arbitrary apportionment on a straight mileage basis by its corporate owners, were returned to those owners as dividends, and in no way represented an intangible asset to the subsidiary. These earnings, since the subsidiary had no independent commercial existence, could add nothing to the value of the subsidiary's physical assets. The capitalization of earnings as an intangible asset, it is said, can be made only

where there is a reasonable expectation that those earnings will continue for a reasonably certain time, which is here fixed by the respondent as 20 years of the physical life of the assets. And, the argument continues, even if the future earnings could be accurately forecast, the assets of the subsidiary could not have been sold at a going concern value for the reason that future earnings, as past earnings, would be derived solely from the subsidiary's corporate owners. No purchaser could be found, in other words, to pay more than the reproduction value of the physical assets less depreciation, for he could not reasonably expect a return on his investment greater than the present value of the physical assets at the prevailing interest rate. Any attempt by the new owner, it is finally said, to extort higher rates from petitioner and its allied corporations, the sole users of the system, would be met, it is safe to conjecture, by the petitioner's replacement of the old carrier by a new system.

This contention leaves out of account, it should be pointed out, the very important fact that for petitioner to have the advantage of reproduction cost in respect of its subsidiary, it must be assumed that it could have obtained the issuance by the Illinois Commerce Commission of a certificate of public necessity and convenience to build a new pipe line which could perform its own carriage contracts and thus avoid the extortionate demands of the purchaser of its old pipe line in that state. But petitioner has not shown that such a certificate would issue to it on demand. True, there is no evidence that it would not issue, but in matters involving a state's public policy, where the act sought is discretionary and not ministerial, we may not lightly assume, without positive evidence, that any application will be granted. In view of respondent's determination, the burden of presenting such evidence is upon petitioner. This it has failed to do. We do not rest our decision, however, on this ground alone, for a much more fundamental principle is here involved.

We have already indicated in our discussion of petitioner's contention that the subsidiary's liquidating dividend was to be treated as falling within the principle of *Southern Pacific Railway* v. *Lowe*, *supra*, that a basic principle of tax law, as declared in *Burnet* v. *Commonwealth Improvement Co.*, *supra*, is that a corporation and its sole shareholder are to be treated as distinct entities. See *Archibald R. Watson*, 42 B. T. A. 52. Upon this rule we now have engrafted the doctrine of *Higgins* v. *Smith*, *supra*, that, where a natural person or a corporation has created or acquired control of another distinct tax entity, it may not avail itself of the legal separateness of personality of its creature from itself to save itself from the incidence of taxation. The Supreme Court said in that case:

The taxpayer cites *Burnet* v. *Commonwealth Co.* [287 U. S. 415] as a precedent for treating the taxpayer and his solely owned corporation as separate entities.

In that case the corporation sold stock to the sole stockholder, the estate of P. A. B. Widener. The transaction showed a book profit and the corporation sought a ruling that a sale to its sole stockholder could not result in a taxable profit. This Court concluded otherwise and held the identity of corporation and taxpayer distinct for purposes of taxation. In the *Commonwealth Improvement Co.* case, the taxpayer, for reasons satisfactory to itself voluntarily had chosen to employ the corporation in its operations. A taxpayer is free to adopt such organization for his affairs as he may choose and having elected to do some business as a corporation, he must accept the tax disadvantages.

On the other hand, the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation. It is command of income and its benefits which marks the real owner of property.

We are of the opinion that that principle applies here; that the petitioner, having organized the subsidiary for its own purposes and presumably for its own advantage, may not plead the latter's substantial identity with petitioner, the parent corporation, but must endure the tax consequences which flow from the existence of the two separate corporations. Having set up a pipe line company for its own purposes, regulated by tariffs approved by the Interstate Commerce Commission and sufficiently high to prevent rival producers from availing themselves of the new facility, but which in fact earned substantial revenue from outside contracts, petitioner may not be heard now to complain that the respondent regards its pipe line company, as it has chosen to treat it itself, as a distinct taxable entity, whose value must be determined according to the recognized method of valuing assets of corporations and not by an exceptional rule invoked at the parent corporation's pleasure. No hardship, in fact, results from such a recognition of actualities and the revenue is saved from what would otherwise constitute an imposition.

We have therefore found as an ultimate fact that the assets of petitioner's subsidiary had a fair market value of $11,100,000 on their distribution in liquidation to petitioner.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

MURDOCK and MELLOTT concur only in the result.

ARUNDELL did not participate in the consideration of or decision in this report.